**STATE of Minnesota, Respondent,**

v.

**Paul Nelson COONROD, Appellant.**

**No. CX–01–2062.**

Court of Appeals of Minnesota.

Nov. 5, 2002.

Mike Hatch, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for respondent.

John M. Stuart, State Public Defender, Michael F. Cromett, Assistant State Public Defender, Minneapolis, MN, for appellant.

Considered and decided by RANDALL, Presiding Judge, LANSING, Judge, and HARTEN, Judge.

## OPINION

RANDALL, Judge.

Appellant Paul Coonrod appeals his conviction of soliciting a child to engage in sexual conduct, arguing that the trial court abused its discretion in admitting evidence of prior bad acts and in instructing the jury on the elements of the offense. He also argues that the evidence did not establish that his conduct violated the statute. Because we conclude that the trial court abused its discretion in admitting evidence of prior bad acts, we reverse and remand.

## FACTS

Appellant Paul Coonrod was charged with soliciting a child to engage in sexual conduct following an Internet child-exploitation sting operation that caught Coonrod communicating in a chat room with "Jaime14," a fictitious persona created by a U.S. postal inspector. After Coonrod had sent a number of sexually explicit e-mail messages to "Jaime14," police arranged a face-to-face meeting, using an adult female undercover officer. When Coonrod appeared at the arranged meeting site and approached the officer, he was arrested.

Ron Miller, the U.S. postal inspector, testified that he was working with a task force targeting the exploitation of children on the Internet, the Internet Crimes Against Children Task Force. Miller testified that he would typically enter an Internet chat room while assuming the identity of a child. Miller testified that on August 3, 2000, he entered MSN Chat, a Microsoft chat room that Miller testified was not limited to adults. Using the name "Jaime14," Miller participated in the chat session and soon received a "whisper" (private communication from another chat room participant) from a "Mnpablito," who turned out to be appellant Coonrod.

Miller testified that "Mnpablito" inquired: "Just 14 and fun?" Coonrod e-mailed a photograph of himself, and Miller responded with a photograph of a female undercover officer taken when she was approximately 14 years old. Miller testified that Coonrod raised the possibility of "Jaime14" visiting his apartment, where they could have sex. Miller, participating under the name "Jaime14," ended the chat room exchange when Coonrod suggested meeting.

Miller testified the e-mail relationship lasted for a month and a half. During this relationship, Coonrod gave "Jaime14" his phone number, sent two more pictures of himself, and then set up a face-to-face meeting for August 18. Although police posted the undercover officer at the arranged meeting site, Coonrod did not appear for the meeting. Miller testified that Coonrod later explained that the meeting place was too close to a police station. Coonrod and the undercover people set a second meeting for September 20. It did take place.

Following Miller's testimony, there was a discussion on possible Spreigl evidence held outside the presence of the jury. The evidence consisted of six or seven file folders found in a search of Coonrod's computer that were labeled with female names. One of these folders was for J.L., a fifteen-year-old whom Coonrod asked to go out with him. The prosecutor moved to admit this evidence, while conceding that she had not provided a formal Spreigl notice to the defense.

The trial court ruled that without the required rule 7.02 notice, the evidence would not be admissible as Spreigl evidence. The court, however, ruled that because there was no challenge to the police search of Coonrod's computer, the police officer could testify to what was found on it "whether or not it is relevant." The court did state it would not admit any testimony from J.L.

Officer Shannon Sills, the undercover officer who played the role of "Jaime14" in the arranged meetings, testified that she had provided a photograph of herself, taken when she was 14 or 15, for use in the Internet operation. Sills testified that she dressed in a "half shirt" and carried a backpack when she went to the arranged site of the September 20 meeting. Officer Sills testified that Coonrod stopped his truck, left the vehicle, waved to her, and then walked toward her, asking as he approached whether she was "Jaime." Sills testified that Coonrod asked about her hair, which had been had cut shorter than in the photograph, and touched her arm, "like we were going to go to [his] car," before police moved in to arrest him. Sills testified that she was 29 years old when this meeting occurred.

Sergeant Brooke Schaub testified that he found about seven file folders on Coonrod's computer "that were associated with female names." Although Schaub testified it was difficult to tell the ages of the females shown in the pictures, he estimated they were aged "16 to 23." In one file folder labeled "Jackie's pics, or Jackie's

web page," Schaub testified he found several pictures of teen-age girls, including one wearing a hockey uniform. Schaub testified that he discovered that someone using Coonrod's e-mail address had left a posting on Jackie's web site, asking her out and leaving Coonrod's phone number. Schaub testified that the web page indicated that Jackie was 15 years old.

On cross-examination, Sergeant Schaub conceded that it would not be illegal generally for an adult to talk about sex with a 16–year–old. He testified that there was evidence on Coonrod's computer that he had done a lot of scanning of personal ads. On re-direct, Schaub testified that there were also a number of "banner ads" for teen chat rooms on Coonrod's computer, indicating Coonrod had an interest in teens.

Coonrod testified that he liked to "goof around" on computers and that he was familiar with chat rooms, which he described as "free-for-alls" where you could not believe anything you read. Coonrod testified that the MSN Chat room where he communicated with "Jaime14" screened people for age, although he admitted that minors could get in by misrepresenting their age or the consent of their parents.

Coonrod testified that he did not think "Jaime14" was actually 14 years old and that the picture he received of her was too small to tell her age. Coonrod also testified that when "Jaime14" called him, it was on his cell phone, while he was in his car, and he did not think he was talking to a 14–year–old. He testified that at their arranged meeting he would have driven away if he had seen a 14–year–old girl. Coonrod testified, in fact, that he had arranged to meet one female at the Mall of America, but walked away when he saw from a distance that she appeared to be 13 or 14 years old.

On cross-examination, Coonrod admitted that he had put in his "whisper" to "Jaime14," "Just 14 and fun?" before "Jaime14" had told him her age. He also admitted that he had disclosed to "Jaime14" a lot of accurate information about himself. Coonrod admitted that he had sent many e-mails to "Jaime14" that were sexual in nature despite having no information indicating she was any age other than 14. When asked about the computer search showing "pictures of young girls in your computer," Coonrod admitted only that he had "pictures of women" on his computer.

The jury found Coonrod guilty as charged. The presumptive sentence was one year and one day stayed. The trial court departed dispositionally, executed the year-and-a-day sentence, and Coonrod went to prison. This appeal follows.

## ISSUES

I. Did the trial court abuse its discretion by allowing evidence of prior bad acts?

II. Did the district court abuse its discretion in instructing the jury on the elements of the offense?

III. Is the evidence sufficient to support the conviction?

## ANALYSIS

### I. Spreigl

■ Coonrod argues that the trial court abused its discretion in admitting evidence that he had created files on his computer for juvenile females whom he had contacted. Coonrod argues that this was Spreigl evidence that should not have been admitted without pretrial notice, which the prosecutor admitted she did not provide. We agree.

A defendant's past acts need not be criminal convictions for the limitations on

the use of Spreigl evidence to apply. *See* Minn. R. Evid. 404(b) (providing that evidence of "another crime, wrong, or act" is not admissible to show action in conformity with the prior act); *State v. Orfi*, 511 N.W.2d 464, 470–71 (Minn.App.1994) (analyzing evidence of defendant's callous attitude and controlling behavior toward his son as Spreigl evidence), *review denied* (Minn. Mar. 15, 1994). The evidence that Coonrod had communicated by electronic means with teen-age girls and had asked one out on a date easily had the potential to prejudice the defense by suggesting to the jury that he acted in conformity with that conduct in contacting "Jaime14."

The state must provide the defense with written pretrial notice of any evidence of other crimes or bad acts that it intends to present at trial (with some narrow exceptions not applicable here). Minn. R.Crim. P. 7.02; *State v. Bolte*, 530 N.W.2d 191, 196–97 (Minn.1995). The state provided no notice of any intent to present evidence of the computer file folders, or any other Spreigl evidence. The state did disclose as a possible witness J.L., the subject of one of the computer file folders, but did not identify her as a Spreigl witness. Although defense counsel admitted receiving police reports referring to the computer file folders, the complaint merely mentioned the search of Coonrod's computer, without reciting any evidence found in that search to indicate the state might be using it to prove the offense. Thus, we cannot conclude that there was substantial compliance with the notice requirement. *See Bolte*, 530 N.W.2d at 199 (holding there was "substantial compliance" with the notice requirement where, although formal Spreigl notice was not given, the police reports alluded to the evidence of another incident, the evidence of that incident was listed among the materials seized from the defendant's home, and the state "did not learn of the relevance of the evidence until after trial commenced"); *Wanglie v. State*, 398 N.W.2d 54, 57–58 (Minn.App.1986) (holding that mention in complaint of other incidents, defense's access to statements and other documents concerning the other incidents, and familiarity of defense counsel with them supported admission of Spreigl evidence).

■ The trial court, while concluding that the computer-file-folder evidence was not admissible as Spreigl evidence because no notice was given, nevertheless admitted the evidence "whether or not it is relevant," merely to show what the police did in executing a valid search warrant. We do not understand that ruling. "Evidence which is not relevant is not admissible." Minn. R. Evid. 402. There was no issue to be decided at trial concerning police execution of the search warrant. It was not a necessary background to the discovery of the offense or to the offense itself. The trial court clearly erred in admitting the computer file folders into evidence on the basis that, because they were the product of a valid search, it did not matter if "they were relevant or not." It is understood that when police execute a valid search warrant, certain items might be found, totally unrelated and irrelevant to the case at hand, perhaps totally personal, perhaps with a capacity for substantial prejudice. Search warrants *define the scope of the search. They do not define admissible evidence.* The scope of admissibility is an entirely different issue and is decided at trial by the trial judge, not by law enforcement when executing a warrant.

■ The erroneous admission of Spreigl evidence can be harmless error if, based on a review of the entire trial record, there is no reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *Bolte*, 530 N.W.2d at 198 (quotation omitted). We

cannot conclude harmless error here on these facts. The (unnoticed) Spreigl evidence suggested to the jury that Coonrod was a predatory person with a propensity to seek out teen-age girls. The Spreigl evidence negated Coonrod's testimony that he was only "goof[ing] around" in the chat room, that he really did not think that "Jaime14" was under 16, and that he had no intention of having sex with anyone that young.

Not only did the Spreigl evidence have the potential to affect the jury's verdict, but also the court failed to instruct the jury on how to properly consider the evidence. This court held in *State v. Smith*, 563 N.W.2d 771, 774 (Minn.App.1997), that where there was no pretrial Spreigl notice and no Spreigl cautionary instruction, it was not harmless error to admit the evidence. The same is true here. Further, the state's evidence was not so overwhelming that we can say there is no reasonable possibility the jury's verdict was affected by the improperly admitted computer file evidence. The jury could have believed Coonrod's claims that the chat room he was in was limited to adults, that he never believed "Jaime14" was underage, that he was just "yanking her chain" by saying outrageous things, and that he knew when Officer Sills phoned him and when he saw her that she was an adult woman. These claims were much less credible once the jury knew that Coonrod was collecting photos of "teen-age girls" on the Internet and using the Internet to ask a 15–year-old girl for a date. Therefore, we must reverse and remand for a new trial. Although the erroneous admission of the Spreigl evidence requires reversal, we also briefly address the other two issues that Coonrod raises.

## II. Elements of the offense

Coonrod argues that the trial court abused its discretion in instructing the jury on the elements of the offense. He contends that the court's instruction that the state had to prove "Jaime14" was fifteen or younger, or that Coonrod reasonably believed her to be that young, improperly diluted the standard of proof beyond a reasonable doubt.

A trial court is given "considerable latitude" in selecting the language of jury instructions. *State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990) (quotation omitted). Jury instructions are viewed in their entirety to determine whether the law of the case is fairly and adequately explained. *State v. Flores*, 418 N.W.2d 150, 155 (Minn.1988).

The Minnesota Supreme Court has held that an instruction in a fourth-degree criminal sexual conduct case on the element of sexual contact that allowed the jury to convict if "the touching could reasonably be construed" as being sexually motivated improperly diluted the standard of proof. *State v. Tibbetts*, 281 N.W.2d 499, 500–01 (Minn.1979). The court noted that this instruction "was tantamount to charging that if this [sexual] purpose could reasonably be inferred," the jury could find the defendant guilty. *Id.* at 500. This would be inconsistent with the "beyond a reasonable doubt" standard, which certainly would require the jury to find more than a reasonable inference of sexual purpose.

Here, the challenged instruction did not invite the jury to find any element of the offense by reasonable inference. The term "reasonable," in fact, applied to the thought process of Coonrod in assessing the age of "Jaime14," not to any thought process of the jury. The jury could have readily understood that it had to determine *beyond a reasonable doubt* that Coonrod "reasonably believed" that "Jaime14" was under 16 (or that she actually was underage). The instruction did

not present a conflict with the beyond-a-reasonable-doubt standard, as the instruction did in *Tibbetts.*

## III. Sufficiency of the evidence

■ Coonrod argues that the evidence was insufficient to show that he solicited a "specific person" whom he "reasonably believed" was a child or that he intended to engage in sex with her. He points out that this was an undercover "sting" operation and that "Jaime14" was a 29–year–old police officer.

■ In reviewing a claim of insufficient evidence, this court examines the record in the light most favorable to the verdict, assuming that the jury believed the state's evidence and disbelieved any contrary evidence. *State v. Daniels,* 361 N.W.2d 819, 826 (Minn.1985). If the jury, acting with due regard for the presumption of innocence and the need for overcoming it by proof beyond a reasonable doubt, could reasonably find the defendant guilty, this court will not reverse the conviction. *State v. Alton,* 432 N.W.2d 754, 756 (Minn.1988).

The statute prohibits the solicitation of a "child," defined as a person aged 15 or younger, to engage in sexual conduct. Minn.Stat. § 609.352, subd. 1(a), (2) (2000). The statute defines the prohibited act as soliciting "a child or someone the person reasonably believes is a child." *Id.,* subd. 2 (2000). The term "solicit" is defined as:

> Commanding, entreating, or attempting to persuade a *specific person,* by telephone, by letter, or by computer or other electronic means.

*Id.,* subd. 1(c) (2000) (emphasis added).

Coonrod argues that the state failed to prove that he solicited a "specific person" or that he reasonably believed that person to be a child. Coonrod also argues that the evidence was insufficient to prove that

he intended to engage in sex with "Jaime14." The first argument presents an issue of statutory construction.

Coonrod argues that the statutory language requiring solicitation of a "specific person" requires solicitation of an *actual* person and therefore precludes criminal liability for soliciting a fictional persona such as "Jaime14."

■ In construing statutes, this court looks first to the plain language of the statute. *State v. Furman,* 609 N.W.2d 5, 6 (Minn.App.2000). If the literal meaning of the statutory language is not conclusive, or if the language is ambiguous, the court looks to other indicia of legislative intent. *See Park Towers Ltd. P'ship v. County of Hennepin,* 498 N.W.2d 450, 454 (Minn. 1993). Also, we agree with appellant that penal statutes must be strictly construed, and all reasonable doubt about their meaning must be resolved in favor of the defendant. *State v. Wagner,* 555 N.W.2d 752, 754 (Minn.App.1996). But this court is not required to give a statute the narrowest possible interpretation. *Id.*

■ The term "specific person" does not denote an "actual person." *See* American Heritage Dictionary 1730 (3d ed.1992) (defining "specific" as "[e]xplicitly set forth; definite"). The term "person" is not defined in the criminal code. A corporation has been held to be a "person" for purposes of the harassment-restraining-order statute. *Dayton Hudson Corp. v. Johnson,* 528 N.W.2d 260, 262 (Minn.App. 1995). For purposes of construing statutes, generally, the term "person" may include partnerships, associations, and corporations. *Opal Corp. v. American Family Ins. Group,* 518 N.W.2d 642, 644 (Minn. App.1994) (citing Black's Law Dictionary, 1162 (6th ed.1990)); *see generally* Minn. Stat. § 645.44, subd. 7 (2000).

■ "Jaime14" was not a corporation or other legal entity. But like those entities, she was not a flesh-and-blood human being either. Coonrod points to no language in the statute, or in the case law, that excludes a fictional persona such as "Jaime14" from the definition of a "person," or a "specific person." This court cannot supply language that the legislature has purposefully omitted or overlooked. *In re Rapp*, 621 N.W.2d 781, 786 (Minn. App.2001). The courts will not infer that the legislature intended an absurd result. *State v. Murphy*, 545 N.W.2d 909, 916 (Minn.1996). A few examples will illustrate the point. "Sting," or "undercover," or "decoy" operations are not uncommon.[1] When a drug dealer has drugs to sell and is "sucked" into an undercover operation, the second he hands over the drugs to an undercover agent in exchange for money, the badge and handcuffs come out, and two things will happen: (a) he will not get to keep the money, and (b) he will not be able to argue that he can be guilty at most of mere possession rather than possession with the intent to sell, or a completed sale, because he had no chance to execute a bona fide sale. Exactly the same is true with undercover operations aimed at arresting prostitutes or their "johns." Law enforcement would be in a high state of consternation if real prostitutes and real johns had to be used and if the possibility of a full successful completion of the transaction had to be present! Coonrod's argument, followed to its logical extreme, would demand that the state, when investigating the type of crime he is charged with, employ actual young girls to type the chat room text, to meet with the suspect, and to follow through with everything needed to get the suspect to the point of an overt act. We simply will not read that into the law.

■ The purpose of the child-solicitation statute is "to prohibit any persuasive conduct by adults that might entice children to engage in sexual activity." *State v. Koenig*, 649 N.W.2d 484, 488 (Minn.App.2002). Solicitation in itself is an "inchoate activity" that extends to a broad range of conduct. *State v. McGrath*, 574 N.W.2d 99, 102 (Minn.App. 1998), *review denied* (Minn. Apr. 14, 1998). The statute explicitly extends that range of conduct to communications by computer. Minn.Stat. § 609.352, subd. 1(c) (2000). Sending e-mails and chat room "whispers" to a specifically identified computer persona with the aim of engaging that person in sexual activity fits within the purpose and language of the statute. The legislature, by requiring that the solicitation be to a "specific person," intended to exclude general messages broadcast to wider audiences, such as personal ads or bona fide media content. There is no reason to believe, however, that the legislature, having forbidden "solicitation" by computerized means, intended to exclude messages directed at a specific computer identity or "persona" that a defendant believed represented a person who was underage.

■ Coonrod also argues that the evidence is insufficient to prove that he reasonably believed "Jaime14" to be a child or that he intended to engage in sex with her. But these arguments assume the credibility of Coonrod's own testimony, particularly his testimony that he knew the person who called him, and who stood on the street corner to meet him on September 20, was an adult female. Assessing

---

1. This is not to say that sting and undercover operations are "a golden child" and unduly favored by the courts. They are not, and the affirmative defense of entrapment is always on the table; it is said rather to point out that sting operations and related deceptive practices by law enforcement are permissible as long as proper boundaries are observed.

the credibility of witnesses is within the exclusive province of the jury. *See State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). The state presented evidence that Coonrod put in one of his first "whispers" to "Jaime14": "Just 14 and fun?" The profile for "Jaime14" showed that she was a 14–year–old female, and the picture sent to Coonrod was of a 14– or 15–year–old girl. The state also presented evidence that Coonrod sent sexually explicit messages to "Jaime14" almost from the beginning, suggesting they meet to have sex in his apartment. Coonrod not only suggested "Jaime14" phone him, he suggested a meeting, eventually appeared for a meeting, and actually led the undercover officer toward his truck. This evidence was sufficient to support the factfinder's determination that Coonrod solicited a child to engage in sexual conduct. Therefore, he may be retried for that offense. *See generally State v. Harris*, 533 N.W.2d 35, 36 n. 1 (Minn.1995) (holding double jeopardy bars further prosecution of defendant whose conviction has been reversed because the evidence is insufficient as a matter of law).

## DECISION

The trial court committed reversible error in admitting Spreigl evidence without pretrial notice and without a cautionary instruction on the basis that since the evidence was found through a valid search warrant, relevancy did not matter.

The court did not abuse its discretion in instructing the jury.

The evidence revolving around a fictitious persona would have supported a conviction for the charged offense.

**Reversed and remanded.**