STATE of Minnesota, Respondent,

v.

Terry Lee HILL, Appellant.

No. 49250.

Supreme Court of Minnesota.

Dec. 21, 1979.

Rehearing Denied Jan. 31, 1980.

Phillip S. Resnick, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas W. Foley, County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

YETKA, Justice.

Defendant was found guilty by a district court jury of a charge of aggravated robbery, Minn.Stat. § 609.245 (1976), and was sentenced by the trial court to a 3- to 20-year term in prison. On this direct appeal defendant makes a number of contentions. First, defendant argues that a judgment of acquittal is required because the state negligently destroyed vital evidence which the defense had subpoenaed. Second, defendant argues that he should be given a new trial because his public defender failed to represent him adequately and because one of the bailiffs made statements to the jurors during their deliberations which had the effect of coercing a verdict. Alternatively, defendant contends that he should be given a new *Schwartz* hearing on the issue of bailiff misconduct because he was not present when the trial court interrogated the jurors. Thirdly, defendant argues that at the very least this court should

hold that the trial court erred in imposing a minimum sentence of 3 years pursuant to Minn.Stat. § 609.11 (Supp.1977) because he personally did not possess a firearm during the commission of the robbery. We affirm.

This prosecution arose from a bar robbery committed by defendant and an accomplice during which the accomplice was armed with a revolver, providing cover while defendant jumped over the bar and took the money from the cash register. Defendant and his accomplice fled in a vehicle driven by the accomplice, but were chased by patrons of the bar, who flagged down the police and told them to follow the fleeing vehicle. When defendant's accomplice lost control of the getaway car and came to a stop, he pulled out his revolver and shot himself in the head, apparently intentionally, killing himself. When he was arrested defendant denied participation in the robbery, claiming he had just been picked up by the accomplice at a shopping center, but 4 hours later defendant changed his statement, admitting that he participated in the robbery but claimed his accomplice forced him to do so. At trial defendant continued to maintain that he was the victim of duress, but the jury disbelieved defendant and found him guilty as charged.

1. Defendant's first contention on appeal relates to the fact that the police department negligently destroyed tape recordings of incoming calls made to the police department on the day preceding the robbery even though the tapes had been subpoenaed by the defense. Defendant contends that he had called the police the day before the robbery to complain about a person who had been harassing his mother in an attempt to locate him and that he believed the person was his accomplice. Defendant contends that the tapes could have provided evidence of his call and tended to indirectly corroborate his testimony that the accomplice finally found him on the day of the robbery and forced him to participate in the robbery. Actually defendant subpoenaed the tapes from 4:00

p.m. to 10:00 p.m. for the day in question and an investigator for the defense listened to the tapes from 5:10 p.m. to 9:01 p.m., believing that the call was made in that time period. Indeed, defendant's mother testified at trial that defendant made the call between 6:30 and 7:00. Not hearing the call described by defendant, the investigator told the police that she was "through" with the tapes, only to return several weeks later after talking to defendant, who said that the call might have been earlier. By then the police had destroyed the tapes in violation of the subpoena, which was still in effect.

■ In this case it appears that if any relief is justified, it would be a judgment of acquittal since a new trial would be affected by the same taint as the first trial—inability of defendant to use the evidence contained in the tape. Since we do not know if the destroyed tapes contained any evidence favorable to defendant, we cannot determine the probable effect which the evidence would have had on the jury. What we must do, therefore, is focus on the evidence adduced at trial in an attempt to determine whether there is any reasonable possibility that the tapes would have substantially influenced the jury. *Government of Virgin Islands v. Testamark*, 570 F.2d 1162 (3rd Cir. 1978). Doing so, we find that there was strong evidence of predisposition of defendant, who had twice before been convicted of aggravated robberies, and strong evidence of motive of defendant, who admitted that he had a $75 a day heroin habit and was unemployed. Further, as we indicated, even if defendant made the call—something which is not clear from the record—the most the tape would have revealed was that "someone" had been harassing his mother. In view of these and other factors as well as the testimony of the eye witnesses, we conclude that, while the negligent destruction of the subpoenaed tapes was a serious action, the verdict would not have been otherwise if the evidence had not been destroyed.

2. Defendant's next contention is that he is entitled to a new trial on the ground that his public defender inadequately represented him and on the ground that the jury's verdict was coerced by the conduct of the bailiff.

There is no merit to the claim of ineffective representation.

Defendant's claim of improper conduct by the bailiff relates to certain statements which the bailiff apparently made to the jury at about 8:00 p.m.—3 hours before they reached a verdict—concerning sleeping arrangements if the jury was unable to reach a verdict that night. Several of the jurors were interrogated at a post-verdict *Schwartz* hearing. They testified that there was some talk about whether they would be able to stay in downtown St. Paul if they had to spend the night in a hotel, because the State Basketball Tournament was on and unoccupied rooms were presumably scarce. It appears that the bailiff gave the information in response to a question. Each of the jurors denied feeling pressured to reach a verdict by the knowledge that they might have to sleep in some hotel other than one downtown and denied that anything the bailiff said pressured them or had any effect on their verdict.

■ The applicable rule is R. 606(b), R. Evid., which provides as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any

statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

This rule generally disallows juror testimony or affidavits to impeach a verdict—see *State v. Domabyl,* 272 N.W.2d 745 (Minn. 1978)—but there are exceptions, as in the case of juror testimony concerning improper contacts between third persons, such as the court itself or a bailiff or one or more jurors. However, the rule is clear that even though the jurors may testify concerning the improper contacts, they may not testify concerning the effect the improper contacts had on their minds. 3 J. Weinstein and M. Berger, *Weinstein's Evidence* § 606[04] (1978), which we cited and quoted from approvingly in the *Domabyl* case, *supra.*

It is clear from this court's decision in *State v. Mims,* 306 Minn. 159, 235 N.W.2d 381 (1975), that any communication relating to the case (*e.g.,* as to when the jury might reach a verdict) occurring during the trial court's uninvited entry into the jury room and in the absence of defendant and counsel constitutes reversible error. There we based our decision of the dominant role of the trial court in the trial process, stating in a footnote that an interruption by the bailiff to arrange for an evening meal, *e.g.,* would not be an analogous wrong, because the bailiff's primary function is to be of service to the jurors. 306 Minn. at 169 n. 6, 235 N.W.2d at 388 n. 6.

However, *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), makes it clear that reversal based on comments by the bailiff may be required, as where a bailiff in effect testifies against the defendant by saying the defendant is "wicked" and "guilty" and that any errors in convicting the defendant be corrected by the appellate court. Somewhat distinguishable from *Parker v. Gladden,* is the case in which the bailiff tells the jury to hurry up. That sort of comment, by virtue of its neutrality as to the result, is less serious than the type of remark made in *Parker v. Gladden,* but it still is potentially prejudicial. *See Government of the Virgin Islands v.*

*Gereau,* 523 F.2d 140 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 42 L.Ed.2d 829 (1976), and *United States v. Brumbaugh,* 471 F.2d 1128 (6th Cir.), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973) (cases in which such comments by the bailiff were deemed nonprejudicial).

■ This case, unlike the cases just cited, is a case in which the bailiff was not trying to influence or pressure the jury, but was simply letting the jurors know—as they had a right to know—what the situation was regarding sleeping accommodations if they could not reach a verdict that night. None of the jurors questioned at the *Schwartz* hearing interpreted the bailiff's remarks as meaning that the court intended to keep them all night if they did not reach a verdict nor did they interpret the remarks as being intended to pressure them to reach a verdict. While the jurors should not have been questioned as to the actual effect of the remarks on their mind—that is, whether they felt coerced—this is a case in which, even in the absence of such testimony, one would infer that the statements of the bailiff did not have the effect of coercing a verdict.

Although we do not believe the record on appeal compels the granting of a new trial, we nonetheless believe that the matter of what the bailiff tells the jury concerning nighttime accommodations is a serious matter and that it might better be dealt with by the trial judge, with the presence of defendant and counsel, informing the jury of the options in open court.

One other related matter concerns the possibility that defendant was not present during the part of the *Schwartz* hearing at which the jurors were interrogated. While defendant would have a right to be present at this hearing just as a defendant has the right to be present at a postconviction hearing at which evidence is taken—*Smude v. State,* 310 Minn. 225, 249 N.W.2d 876 (1976) —the state of the record on appeal does not permit a resolution of the issue of whether defendant was present at the hearing. Further, even if the defendant was denied

his right to be present he has failed to show any prejudice flowing from that denial. *See State v. Bryant*, 281 N.W.2d 712 (Minn. 1979), where, although it was clear that the defendant was not present when, before the trial actually started, the court examined and dismissed two jurors outside defendant's presence, we held that any error occasioned by defendant's absence was nonprejudicial.

3. Defendant's final contention is that he is entitled to a striking of the minimum term part of his sentence.

Minn.Stat. § 609.11 (Supp.1977) reads as follows:

> All commitments to the commissioner of corrections for imprisonment of the defendant are without minimum terms except when sentence is to life imprisonment as required by law and except that any commitment following the defendant's first conviction of an offense wherein he had in his possession a firearm or used a dangerous weapon at the time of the offense shall be for a term of not less than one year plus one day, nor more than the maximum sentence provided by law for the offense for which convicted, and except that any commitment following defendant's second or subsequent conviction of an offense wherein he had in his possession a firearm or used a dangerous weapon at the time of the offense shall be for a term not less than three years, nor more than the maximum sentence provided by law for the offense for which convicted, and such person shall not be eligible for parole until he shall have served the full minimum sentence herein provided, notwithstanding the provisions of sections 242.19, 243.05, 609.12 and 609.135. The offenses for which mandatory minimum sentences shall be served as herein provided are: aggravated assault, burglary, kidnapping, manslaughter, murder in the second or third degree, robbery, criminal sexual conduct in the first, second or third degree, escape

while under charge or conviction of a felony, or discharge of an explosive or incendiary device.

There are two different approaches which one could take to this issue:

On the one hand, one could point to the general rule that "When it cannot be said with certainty that the legislature intended to authorize the imposition of the minimum term or an extended term in a particular situation, the presumption must be that the legislature did not intend to do so." *State v. Simmons*, 258 N.W.2d 908, 910 (Minn. 1977). Relying on this principle, one arguably could, as the Florida Supreme Court did in *Earnest v. State*, 351 So.2d 957 (Fla. 1977), hold that the phrase "in his possession" requires actual possession of a firearm during the commission of the crime.

■ On the other hand, it appears to us that the use of the phrase "in his possession" was meant to distinguish firearms, which—if § 609.11 is to apply—only have to be possessed during commission of the robbery or crime, from other dangerous weapons, which have to be used during the commission of the crime. Further, any other interpretation would be to ascribe to the legislature an intent to provide for basically unfair differential treatment of two or more equally culpable accomplices to a crime in which one actually possesses a firearm during the commission of the crime but the other accomplices do not. We believe that the legislature intended the minimum term statute to apply not just to the accomplice who actually possessed the gun during the commission of the crime, but to any other accomplices who intentionally committed the crime knowing that a firearm would be used in the commission of the crime.[1] Accordingly, we conclude that imposition of the minimum term in this case was justified.

Affirmed.

---

1. Although not a factor in our decision, we note that the legislature recently made explicit what we now hold was theretofore implicit. *See* 1979 Minn.Laws, ch. 258, § 1, amending § 609.-11.